IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| DUSTYN BANIK, ALMA SANCHEZ, AND GERRAN BANIK, *Plaintiffs*, | § § § § | |
| v. | § | CIVIL ACTION NO. 4:25-cv-2487 |
| CITY OF BRENHAM, TEXAS; CORPORAL TINA BRUNO; SERGEANT ASHLEY BATSON, NEE BURNS; LIEUTENANT KELVIN RAVEN; OFFICER. LEDARION JENKINS *Defendants*. | § § § § § § § | |

DEFENDANTS' OPPOSED MOTION FOR FINAL SUMMARY JUDGMENT

Defendants City of Brenham, Texas, and Brenham police officers Lieutenant Kelvin Raven, Sergeant Ashley Batson, Corporal Tina Bruno, and Officer LeDarion Jenkins, move under FED. R. CIV. P. 56, to dismiss all Plaintiffs' claims and Defendants request entry of final judgment in Defendants' favor.

CERTIFICATE OF CONFERENCE

Defense counsel conferred with Plaintiffs' counsel. Plaintiffs oppose the relief requested.

TABLE OF CONTENTS

CERTIFICATE OF CONFERENCE ..... i

TABLE OF CONTENTS ..... ii

TABLE OF AUTHORITIES ..... iii

TABLE OF EXHIBITS ..... x

SUMMARY OF THE ARGUMENT ..... 1

ISSUES BEFORE THE COURT ..... 1

NATURE AND STAGE OF THE PROCEEDING ..... 1

STATEMENT OF FACTS ..... 2

SUMMARY JUDGMENT STANDARD ..... 6

ARGUMENT AND AUTHORITIES ..... 7

I. No evidence supports a Fourth Amendment claim. ..... 7

A. The investigative stop of a reported assault was justified at its inception. ..... 8

B. The stop was not unnecessarily prolonged by officers. ..... 10

II. No evidence supports a First Amendment claim. ..... 12

III. Plaintiffs do not refute any officer's qualified immunity ..... 14

IV. No evidence supports a claim against the City of Brenham. ..... 16

A. Brenham's City Council is the City's policymaker. ..... 17

B. No evidence supports a ratification claim. ..... 19

C. No evidence supports a failure to train claim. ..... 21

D. No pattern of unconstitutional conduct exists. ..... 24

E. No culpability of, or causation by, the City's policymaker exists. ..... 24

CONCLUSION AND PRAYER ..... 25

CERTIFICATE OF SERVICE ..... 26

TABLE OF AUTHORITIES

**Federal Cases**

*Alabama v. White*,
496 U.S. 325 (1990) ........ 8

*Allen v. Hays*,
65 F.4th 736 (5th Cir. 2023) ........ 20

*Anderson v. Creighton*,
483 U.S. 635 (1987) ........ 15

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 6

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ........ 15

*Atteberry v. Nocona Gen. Hosp.*,
430 F.3d 245 (5th Cir. 2005) ........ 7

*Atwater v. City of Lago Vista*,
532 U.S. 318 (2001) ........ 7

*Batyukova v. Doege*,
994 F.3d 717 (5th Cir. 2021) ........ 12

*Bd. of Cnty. Comm'rs of Bryan Cnty, Okl. v. Brown*,
520 U.S. 397 (1997) ........ 21, 23, 25

*Benavides v. County of Wilson*,
955 F.2d 968 (5th Cir. 1992) ........ 22

*Benfer v. City of Baytown*,
120 F.4th 1272 (5th Cir. 2024) ........ 6

*Bennett v. City of Slidell*,
728 F.2d 762 (5th Cir.) (en banc), cert. denied, 472 U.S. 1016 (1985) ........ 16, 17, 18

*Bolton v. City of Dallas*,
541 F.3d 545 (5th Cir. 2008) ........ 17, 18

*Brown v. Bryan Cnty., Okl.*,
219 F.3d 450 (5th Cir. 2000) ........ 23

*Brown v. City of Houston*,
337 F.3d 539 (5th Cir. 2003) .......... 18

*Brown v. Lyford*,
243 F.3d 185 (5th Cir. 2001) .......... 16

*Brumfield v. Hollins*,
551 F.3d 322 (5th Cir. 2008) .......... 16

*Butz v. Economou*,
438 U.S. 478 (1978) .......... 16

*Carnaby v. City of Houston*,
636 F.3d 183 (5th Cir. 2011) .......... 7

*City & Cnty of San Francisco v. Sheehan*,
575 U.S. 600 (2015) .......... 15, 16

*City of St. Louis v. Praprotnik*,
485 U.S. 112 (1988) .......... 17, 18, 19

*Club Retro LLC v. Hilton*,
568 F.3d 181 (5th Cir. 2009) .......... 14

*Coleman v. Houston Indep. Sch. Dist.*,
113 F.3d 528 (5th Cir. 1997) .......... 6

*Conner v. Travis County*,
209 F.3d 794 (5th Cir. 2000) .......... 22

*Coon v. Ledbetter*,
780 F.2d 1158 (5th Cir. 1986) .......... 20

*Covington v. City of Madisonville*,
Texas, 2023 WL 5346375 (5th Cir. 2023) .......... 25

*D.C. v. R.W.*,
608 U.S. 22 (2026) .......... 8

*Davidson v. City of Stafford*,
848 F.3d 384 (5th Cir. 2017) .......... 19

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......... 7, 15

*Escondido v. Emmons*,
586 U. S. 38 (*per curiam*) ........................................ 15

*Eversley v. Mbank*,
843 F.2d 172 (5th Cir. 1988) ........................................ 7

*Fraire v. City of Arlington*,
957 F.2d 1268 (5th Cir. 1992) ........................................ 19, 24, 25

*Gabriel v. City of Plano*,
202 F.3d 741 (5th Cir. 2000) ........................................ 23

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) (Alito, J, concurring) ........................................ 12, 13, 14

*Grandstaff v. Borger*,
767 F.2d 161 (5th Cir. 1985) ........................................ 19, 20

*Groh v. Ramirez*,
540 U.S. 551 (2004) (Kennedy, J., dissenting) ........................................ 16

*Hall v. Trochessett*,
105 F.4th 335 (5th Cir. 2024), cert. denied, 145 S. Ct. 1173 (2025) ........................................ 10

*Heien v. North Carolina*,
574 U.S. 54 (2014) ........................................ 16

*Henderson v. Harris Cnty., Texas*,
51 F.4th 125 (5th Cir. 2022) ........................................ 23

*Hobart v. City of Stafford*,
916 F. Supp. 2d 783 (S.D. Tex. 2013) (Ellison, K.) ........................................ 20

*Hucheson v. Dall. Cty.*,
994 F.3d 477 (5th Cir. 2021) ........................................ 23

*James v. Harris County*,
577 F.3d 612 (5th Cir. 2009) ........................................ 17

*Jett v. Dallas Indep. Sch. Dist.*,
491 U.S. 701 (1989) ........................................ 17

*Kansas v. Glover*,
589 U.S. 376 (2020) ........................................ 8

*Keenan v. Tejeda*,
290 F.3d 252 (5th Cir. 2002) ........................................................................ 13

*Kisela v. Hughes*,
584 U.S. 100 (2018) (*per curiam*) ................................................................ 15

*Liggins v. Duncanville*,
52 F.4th 953 (5th Cir. 2022) ................................................................... 17, 25

*Maryland v. Pringle*,
540 U.S. 366 (2003)........................................................................................ 7

*Mason v. Lafayette City-Parish Consolidated Government*,
806 F.3d 268 (5th Cir. 2015) ........................................................................ 24

*Estate of Davis ex rel. McCully v. City of N. Richland Hills*,
406 F.3d 375 (5th Cir. 2005) ........................................................................ 24

*Morgan v. Swanson*,
659 F.3d 359 (5th Cir. 2011) ........................................................................ 15

*Morrow v. Meachum*,
917 F.3d 870 (5th Cir. 2019) ................................................................. 14, 15

*Mt. Healthy City Bd. of Ed. v. Doyle*,
429 U. S. 274 (1977)...................................................................................... 12

*Nieves v. Bartlett*,
587 U.S. 391 (2019)....................................................................... 12, 13, 14

*Pena v. Grande City*,
879 F.3d 613 (5th Cir. 2018) ........................................................................ 23

*Perdomo v. City of League City. Texas*,
163 F.4th 921 (5th Cir. 2026) ....................................................................... 14

*Peterson v. City of Fort Worth*,
588 F.3d 838 (5th Cir. 2009) ........................................................... 19, 20, 24

*Pfannstiel v. City of Marion*,
918 F.2d 1178 (5th Cir. 1990) ...................................................................... 16

*Pineda v. City of Houston*,
291 F.3d 325 (5th Cir. 2002) ........................................................................ 22

*Piotrowski v. City of Houston*,
237 F.3d 567 (5th Cir. 2001) .................................................................. 17, 21, 23, 24

*Prado Navarette v. California*,
572 U.S. 393 (2014)........................................................................................ 8

*Ramirez v. Guadarrama*,
3 F.4th 129 (5th Cir. 2021) ......................................................................... 15

*Reichle v. Howards*,
566 U.S. 658 (2012)...................................................................................... 15

*Reitz v. Woods*,
85 F.4th 780 (5th Cir. 2023) ....................................................................... 13

*Renfroe v. Parker*,
974 F.3d 594 (5th Cir. 2020) ......................................................................... 6

*Roberts v. City of Shreveport*,
397 F.3d 287 (5th Cir. 2005) ................................................................. 21, 22

*Saldana v. Garza*,
684 F.2d 1159 (5th Cir. 1982) ..................................................................... 16

*Sanders-Burns v. City of Plano*,
594 F.3d 366 (5th Cir. 2010) ....................................................................... 23

*Scott v. Harris*,
550 U.S. 372 (2007).......................................................................................... 7

*Smith v. Harris County*,
956 F.3d 311 (5th Cir. 2020) ....................................................................... 14

*Snyder v. Trepagnier*,
142 F.3d 791 (5th Cir. 1998) ....................................................................... 20

*Sorenson v. Ferrie*,
134 F.3d 325 (5th Cir. 1998) ....................................................................... 16

*Swint v. Chambers County Commission*,
514 U.S. 35 (1995)......................................................................................... 14

*Terry v. Ohio*,
392 U.S. 1 (1968)............................................................................................. 7

*Tharling v. City of Port Lavaca*,
329 F.3d 422 (5th Cir. 2003) .......... 17

*United States v. Arvizu*,
534 U.S. 266 (2002) .......... 8, 9

*United States v. Bass*,
996 F.3d 729 (5th Cir. 2021) .......... 8, 11

*United States v. Brigham*,
382 F.3d 500 (5th Cir. 2004) .......... 11

*United States v. Sharpe*,
470 U.S. 675 (1985) .......... 11, 12

*Valle v. City of Houston*,
613 F.3d 536 (5th Cir. 2010) .......... 23

*Waganfeald v. Gusman*,
674 F.3d 359 (5th Cir. 2011) .......... 15

*Webb v. Town of Saint Joseph*,
925 F.3d 209 (5th Cir. 2019) .......... 17

*White v. Pauly*,
580 U.S. 73 (2017) .......... 15

*Whren v. United States*,
517 U.S. 806 (1996) .......... 10

*Worsham v. City of Pasadena*,
881 F.2d 1336 (5th Cir. 1989) .......... 18

*Zarnow v. City of Wichita Falls Tex.*,
614 F.3d 161 (5th Cir. 2010) .......... 21

*Zorn v. Linton*,
146 S. Ct. 926 (2026) .......... 15, 16

**State Cases**

*Burch v. City of San Antonio*,
518 S.W.2d 540 (Tex. 1975) .......... 18

*Central Power & Light Co. v. City of San Juan*,
962 S.W.2d 602 (Tex. App.—Corpus Christi 1998, pet. dism'd) .......... 17

*City of San Antonio v. Rodriquez*,
856 S.W.2d 552 (Tex. App. — San Antonio 1993, writ denied) ... 17

*Ste-Marie v. State*,
32 S.W.3d 446 (Tex. App.—Houston [14th Dist.] 2000, no pet.) ... 10

*Wilson v. State*,
1999 WL 548641 (Tex.App.-Houston [1st Dist.] 1999, pet. for discretionary review refused) ... 10

*Wilson v. State of Texas*,
2019 WL 3819537 (Tex. App. – Houston [1st Dist. 2019, no pet.]) ... 10

**Constitutions**

First Amendment ... 1, 6, 12, 13, 14

Fourth Amendment ... 1, 2, 7, 10, 20, 22

**Statutes**

42 USC § 1983 ... 1

TEX. LOC. GOV'T CODE Chapters 21 and 51 ... 18

TEX. OCC. CODE § 1701.251 ... 21

TEX. OCC. CODE § 1701.253(c)(k) ... 21

TEX. OCC. CODE § 1701.307(a) ... 21

TEX. OCC. CODE § 1701.351(a)-(c) ... 21

TEX. PENAL CODE § 22.01 ... 9

TEX. PENAL CODE § 42.01 ... 10

TEX. PENAL CODE § 38.02 ... 3, 4, 10, 12, 20, 22

# TABLE OF EXHIBITS

EXHIBIT 1- Plaintiff Gerran Banik Deposition

EXHIBIT 2- Plaintiff Dustyn Banik Deposition

EXHIBIT 3- Alma Sanchez Deposition

EXHIBIT 4- Officer Ladarion Jenkins Deposition

EXHIBIT 5- Corporal Tina Bruno Deposition

EXHIBIT 6- Sergeant Ashley Burns Deposition

EXHIBIT 7- Lieutenant Kelvin Raven Deposition

EXHIBIT 8- Lieutenant Steven Eilert Deposition

EXHIBIT 9- Officer Ladarion Jenkins Body Worn Camera Recording

EXHIBIT 10- Corporal Tina Bruno Body Worn Camera Recording

EXHIBIT 11- Sergeant Ashley Burns Body Worn Camera Recording

EXHIBIT 12- Store Surveillance Video

EXHIBIT 13- Written complaints of Gerran and Dustyn Banik

EXHIBIT 14- Email Correspondence from Texas Ranger and Dustyn Banik-

EXHIBIT 15- Oath of Office for All Officers

EXHIBIT 16- Withdrawn

EXHIBIT 17- Brenham Police Department City Policy Manual and City HR Manual

EXHIBIT 18- Incident Report

EXHIBIT 19- Brenham City Charter and City Ordinances

EXHIBIT 20- Governmental Records declaration.

## SUMMARY OF THE ARGUMENT

1. The summary judgment record establishes that Defendants are entitled to summary judgment in their favor. There is no evidence that any officer violated the Plaintiffs' rights or clearly established federal law. Instead, the evidence shows reasonable suspicion supported temporary detention of Plaintiffs for a period not exceeding one-hour while an assault investigation occurred. The evidence further establishes that the City of Brenham trained its officers regarding the constitutional limitations under the Fourth and First Amendments and that the City's policymaker is not culpable for causing any violation of Plaintiffs' rights.

## ISSUES BEFORE THE COURT

2. Whether the evidence supports Plaintiffs Dustyn Banik's and Gerran Banik's claims against Officer Jenkins, Corporal Bruno, and Sergeant Burns under the Fourth Amendment.

3. Whether the evidence supports Plaintiffs claims against Officer Jenkins, Corporal Bruno, Sergeant Burns, at Lieutenant Raven under the First Amendment.

4. Whether the evidence supports Plaintiffs claims of municipal liability under a failure to train or ratification theory.

## NATURE AND STAGE OF THE PROCEEDING

5. Plaintiffs filed suit on May 30, 2025, asserting claims against the City of Brenham, Texas, and its police officers Lieutenant Kelvin Raven, Sergeant Ashley Batson, Corporal Tina Bruno, and Officer LeDarion Jenkins under 42 USC §1983. ECF No. 1. The Court granted leave for Plaintiffs to file their First Amended Complaint, wherein Plaintiffs voluntarily dismissed the Fourth Amendment claims against Lieutenant Raven, amended Alma Sanchez's claims, and amended their municipal liability claim against the City. ECF No. 17, 20. On August 13, 2026, Alma Sanchez stipulated dismissal of her claims. Plaintiffs Dustyn and Gerran Banik continue to prosecute First Amendment claims against all officers, municipal liability claim against the City

and Fourth Amendment claims against Sergeant Batson, Corporal Bruno and Officer Jenkins. Defendants timely file their motion for summary judgment challenging all claims.

STATEMENT OF FACTS

6. On October 12, 2023, before 8:30 a.m., Mieshia Rogers drove to the Waez Convenience Store lot in Brenham. Ex. 18 at p. 2. Plaintiffs' white Ford F-150 and utility trailer were parked at the gas pumps with the passenger door open, and Rogers said she had to squeeze her car past Plaintiff's truck to park. Ex. 12 at 03:45-04:48; Ex. 9 at 02:07-02:30; Ex. 18 at p. 2. After Rogers parked, Gerran[1] exited the truck and walked toward the truck bed where he stopped and stared at Rogers' car. Ex. 12 at 03:45-05:03. As Rogers exited her car and approached the store, she spoke to Gerran, who approached with his hands raised, and the two appeared to argue near the store entrance. Ex. 12 at 05:03-05:16. Dustyn approached carrying a bag of ice, pulled Gerran back by the arm, and Dustyn threw the bag toward Rogers as she turned to enter the store. Ex. 12 at 05:16-05:25. After the bag struck Rogers, two bystanders tried to de-escalate the confrontation, and Rogers pushed Dustyn when Dustyn approached Rogers as if to make physical contact. Ex. 12 at 05:24-05:30. Dustyn retrieved the bag and approached Rogers again, prompting Gerran to step between Dustyn and Rogers. Ex. 12 at 05:30-06:02. Rogers retrieved her phone from her car, Dustyn and Alma Sanchez returned to their truck, while Gerran and Rogers continued arguing until they returned to their vehicles. Ex. 12 at 06:05-08:40. Plaintiffs' vehicle left onto Highway 105 and Rogers followed in her car while calling 911 reporting an assault. Ex. 12 at 08:40-09:15.

7. Rogers told dispatch that an ice bag struck her and described two white men and a Hispanic woman. Ex. 18 at p. 15208. Dispatch informed officers that a man had thrown an ice bag at the complaining party during an altercation. Ex. 4 at p. 11; Ex. 5, at p. 24. Officer Jenkins and Corporal

[1] Because Plaintiffs share a surname, Plaintiffs will be referred to by their given name.

Bruno responded. Ex. 9-10. Officer Jenkins arrived first at the parties' parked vehicles and Officer Jenkins interviewed Rogers while Corporal Bruno spoke with Plaintiffs. Ex. 9 at 00:01-00:53. Plaintiffs yelled toward Officer Jenkins and Rogers, interrupting the interview, and Corporal Bruno asked Plaintiffs to stop escalating the situation. Ex. 10 at 00:19-01:05. Dustyn testified Corporal Bruno's remarks made Dustyn feel "bullied," and Gerran requested a sergeant because Gerran believed Corporal Bruno was aggressive. Ex. 2 at pp. 39, 44; Ex. 10 at 00:19-01:05.

8. Rogers told Officer Jenkins the driver struck her arm with a bag of ice during an argument. Ex. 9 at 00:01-00:38. Rogers described to Officer Jenkins a second verbal confrontation after the parties stopped along the road where Plaintiffs called Rogers racial slurs, and Rogers stated she felt no pain from the bag. Ex. 9 at 00:40-03:00. Plaintiffs told Officer Jenkins and Corporal Bruno that Rogers had driven fast and nearly hit Plaintiffs' parked truck at the gas station; Gerran said Rogers insulted Gerran. Ex. 9 at 03:20-04:30; Ex. 10 at 01:30-02:55. Gerran characterized the encounter as verbal, stated a bystander intervened to tell Gerran, "I'm not going to let you hit her," and Gerran said Rogers followed Plaintiffs after they left the store. Ex. 10, at 02:50-03:28.

9. When Officer Jenkins asked who had thrown the bag and explained Rogers's allegation, Plaintiffs denied throwing any bag. Ex. 9 at 04:27-05:02. Officer Jenkins said he was following up on the allegation, and Gerran urged the officers to review the cameras. Ex. 9 at 05:02-05:34; Ex. 10, at 05:32-05:34. Officer Jenkins requested identification, which Plaintiffs refused to provide. Ex. 9 at 05:34-05:50. Officer Jenkins and Corporal Bruno told Plaintiffs they had to identify themselves while detained for the assault investigation; both Officer Jenkins and Corporal Bruno later acknowledged that their statements were inaccurate under Texas Penal Code § 38.02 since the officers were only investigating Plaintiffs for suspicion of assault. Ex. 4 at pp. 9, 15; Ex. 5 at pp. 25, 27-28, 35-36, 54-55.

10. Plaintiffs continued to vehemently dispute the identification request despite officer efforts to investigate the reported assault. Ex. 9 at 05:36-07:15; Ex. 10 at 04:37-06:13. **Plaintiffs were detained at 8:37:01 a.m.** when Corporal Bruno informed Plaintiffs they were not free to leave. Ex. 10 at 06:18-06:20. **At approximately 8:37:57 a.m., Officer Jenkins and Corporal Bruno handcuffed Gerran and Dustyn for suspicion of assault.** Ex. 4, at pp. 9, 15; Ex. 5 at pp. 25, 27-28, 35-36, 54-55; Ex. 9 at 07:18-07:31; Ex. 10 at 06:18-06:20.

11. Sergeant Burns arrived at approximately 8:40 a.m. after dispatch reported an alleged gas station assault. Ex. 6, at pp. 21-22; Ex. 11 at 00:50-01:10. Sergeant Burns separated the handcuffed Plaintiffs so Sergeant Burns could speak with them individually and Sergeant Burns explained to Gerran that he was detained while officers investigated Rogers's allegation of assault. Ex. 11, at 01:20-03:00. Sergeant Burns asked Gerran for identification and Gerran eventually provided his identification; Sergeant Burns later acknowledged that her statement of § 38.02 was incorrect in that moment, because other officers detained Gerran pending the investigation of assault where Gerran was a suspect. Ex. 11 at 03:00-04:20; Ex. 6 at pp. 17-18, 23. After more quibbling about the identification request, Gerran gave Sergeant Burns his account of the gas station encounter, and Sergeant Burns said officers would review the surveillance video. Ex. 11 at 04:25-07:47. Sergeant Burns directed Corporal Bruno to place Gerran in a patrol vehicle during the assault investigation. Ex. 11 at 07:47-09:07. Corporal Bruno escorted Gerran to the vehicle, where Officer Jenkins frisked him and placed **Gerran inside the patrol vehicle at approximately 8:49 a.m**. Ex. 9 at 18:15-18:41; Ex. 10 at 27:56-28:22.

12. Sergeant Burns told Dustyn that he too was detained for investigation of Rogers's assault allegation. Ex. 11, at 09:18-10:10. Sergeant Burns requested Dustyn's identification which Sergeant Burns later acknowledged that her statement of § 38.02 was incorrect in that moment

because other officers detained Dustyn pending the investigation of assault where Dustyn was a suspect; Dustyn gave Officer Jenkins his driver's license number. Ex. 11, at 10:35-12:37; Ex. 6 at pp. 17-18, 23. Officers determined Sanchez was uninvolved and told Sanchez she was free to leave. Ex. 11, at 12:37-13:44. Officer Jenkins frisked Plaintiff Gerran for weapons and **Officer Jenkins placed Gerran in the patrol car at 08:54 am**. Ex. 9 at 22:45-23:26; Ex. 11, at 13:44-14:03.

13. Sergeant Burns arranged for Corporal Bruno to obtain the store's surveillance recording while Sergeant Burns and Officer Jenkins interviewed Rogers further. Ex. 11 at 14:30-19:16. Sergeant Burns contacted Lieutenant Raven because a Plaintiff had requested a lieutenant, Ex. 11 at 19:40-21:10, Sergeant Burns took a call from Corporal Bruno who was having difficulty retrieving the surveillance video, Ex. 11 at 21:10-24:13, and Sergeant Burns consulted County Attorney Judson Hall about the assault allegation. Ex. 11 at 24:55-33:37; Ex. 6 at pp. 28-29, 31.

14. Sanchez approached Sergeant Burns and gave officers information disputing Rogers's account. Ex. 11 at 31:30-32:50. Rogers also alleged that Gerran displayed a Confederate flag tattoo at Rogers and said "this is what we do to niggers" before police arrived to the scene; Sergeant Burns consulted the County Attorney's office about whether that conduct implicated another criminal offense. Ex. 11 at 33:40-37:40. Gerran later admitted displaying the tattoo but denied using the slur. Ex. 1 at pp. 30-31. **Corporal Bruno returned at 9:18 a.m.** with a recording of the surveillance footage; Sergeant Burns, Corporal Bruno, and Officer Jenkins reviewed the surveillance footage several times to assess Rogers's assault allegation. Ex. 11 at 38:47-46:26. Lieutenant Raven arrived at approximately 9:26 a.m. and received a summary of the allegation, witness statements, video, and identification dispute. Ex. 11 at 46:15-49:45. Sergeant Burns planned to release Plaintiffs and refer the reports to municipal court for Class C assault; Lieutenant Raven agreed. Ex. 11 at 49:45-50. **Officer Jenkins and Corporal Bruno released Plaintiffs at**

**9:31 am**, Ex. 9 at 1:00:19-1:00:57, while Sergeant Burns informed Rogers of the outcome and took additional photographs. Ex. 11 at 49:50-52:35.

15. After his release, Dustyn approached Lieutenant Raven to argue about the identification requests. Ex. 11 at 54:55-59:22. Lieutenant Raven, who believed the encounter began as a vehicle stop, told Dustyn that a suspect in a reported assault should identify himself. Ex. 7 at pp. 29-33; Ex. 11 at 54:55-59:22. Gerran testified that he does not claim Lieutenant Raven violated his First Amendment rights. Ex. 1 at p. 69. Lieutenant Raven explained the citizen complaint process and, after Dustyn loudly said "Fuck" near a residential area where others were present, Lieutenant Raven told Dustyn he was committing disorderly conduct. Ex. 11 at 59:22-1:00.

16. Plaintiffs made a written complaint. Ex. 13. Police Chief Lloyd Powell investigated, found the complaints unfounded, and sent disposition letters to Plaintiffs. Ex. 13; Ex. 1 at p. 54; Ex. 2 at pp. 52-53. At Plaintiffs' request, the Texas Rangers investigated the facts and found no evidence of misconduct, concluding officers detained Plaintiffs during the assault investigation. Ex. 14.

## SUMMARY JUDGMENT STANDARD

17. To avoid summary judgment, Plaintiff must identify "significant probative evidence" demonstrating a genuinely disputed material fact that presents a triable issue. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). Factual disputes are material if they "might affect the outcome of the suit under the governing law," and they are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). After a motion for summary judgment is filed, the non-movant must identify evidence showing a genuine issue for trial. *Coleman v. Houston Indep. Sch. Dist.*, 113 F.3d 528, 533 (5th Cir. 1997). Substantive law will dictate facts that are material. *Anderson*, 477 U.S. at 248.

18. In this case, objective constitutional and immunity standards, viewed from the perspective of a reasonable firefighter on the scene, *Benfer v. City of Baytown*, 120 F.4th 1272, 1282 (5th Cir.

2024), provide relevant context for identifying requisite material evidence, and only disputes over those material facts can preclude judgment. *See Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). The Court must credit undisputed facts supporting judgment. *Eversley v. Mbank*, 843 F.2d 172, 173–74 (5th Cir. 1988). "Although [courts] review the evidence in the light most favorable to the non-moving party, [courts] assign greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

ARGUMENT AND AUTHORITIES

**I. No evidence supports a Fourth Amendment claim.**

19. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide 'whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to' probable cause.'" *District of Columbia v. Wesby*, 583 U.S. 48, 56-57 (2018) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). "Because probable cause 'deals with probabilities and depends on the totality of the circumstances,' it is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules.'" *Id* (internal citations omitted). But probable cause is not required for an investigative stop short of an arrest.

20. In *Terry v. Ohio*, 392 U.S. 1, 22 (1968) the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." When discussing how reviewing courts should make reasonable-suspicion determinations, the Supreme Court has "said repeatedly that [Courts] must look at the 'totality of the circumstances'

of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This is "an analysis that precludes the 'evaluation and rejection' of 'factors in isolation from each other.'" *D.C. v. R.W.*, 608 U.S. 22, 24 (2026) (quoting *Arvizu*, 534 U.S. at 273-274). "Although a mere 'hunch' does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Prado Navarette v. California*, 572 U.S. 393, 397 (2014) (quotation altered). "Because it is a "'less demanding' standard, 'reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause.'" *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)). The standard "'depends on the factual and practical considerations of everyday life on which *reasonable and prudent men*, not legal technicians, act.'" *Id* at 380 (quoting *Prado*, 572 U.S. at 402). Rather "[i]t permits officers to make 'commonsense judgments and inferences about human behavior.'" *D.C.*, 608 U.S. at 25 (citing *Glover*, 589 U.S., at 380–381).

**A. The investigative stop of a reported assault was justified at its inception.**

21. "When analyzing the legality of an investigative stop, [the Fifth Circuit] makes a two-part inquiry. First, [the Fifth Circuit] consider[s] whether the officer's decision to make the stop was justified [by reasonable suspicion] at its inception." *United States v. Bass*, 996 F.3d 729, 737 (5th Cir. 2021) (internal citation omitted). Officer Jenkins and Corporal Bruno responded to a reported assault. The information Officer Jenkins, Corporal Bruno, and Sergeant Burns learned *before* arrival to support their reasonable suspicion of assault for the initial investigative stop was:

1) Ms. Rodgers had contacted the police department and informed them she had been assaulted; [Ex. 18 at p.15208; Ex. 4, at p. 11; Ex. 5, at p. 24]
2) Ms. Rodgers described the suspects as two white males and one Hispanic female; [Ex. 18 at p.15208; Ex. 4, at p. 11; Ex. 5, at p. 24; Ex.6 at p. 25-26]

3) Ms. Rodgers followed the assault suspects and reported their and her location; [Ex. 18 at p.15208]

22. Upon arrival, Officer Jenkins, Corporal Bruno, and Sergeant Burns learned of the following information *after* arrival on the scene and through interviews of the reporting party, Ms. Rogers, and the Plaintiffs:

4) The Baniks are two white males, and Alma Sanchez is a Hispanic female. [Ex. 9, at 00:01-00:53; Ex. 10 at 00:19-01:05; Ex. 11 at 00:50-01:10]
5) Ms. Rodgers personally informed Officer Jenkins of the assault at the location in which the Baniks had voluntarily stopped; [Ex. 9 at 00:01-03:00]
6) The Baniks voluntarily informed Corporal Bruno of their involvement and interactions with Ms. Rodgers at the convenience store, therefore identifying themselves as the persons reported by Ms. Rodgers as having committed the assault. [Ex. 9 at 03:20-04:30; Ex. 10 at 01:30-03:28].

23. Under Tex. Penal Code §22.01, a person commits Assault if the person "intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." A person can further commit assault by causing or threatening another with imminent bodily injury. *Id.*

24. Any objective officer could have reasonably believed the facts in the summary judgment record were sufficient to detain and investigate whether a violation of Texas Penal Code Section 22.01 occurred. No evidence refutes reasonable suspicion for a detention to investigate whether probable cause exists. "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

25. Despite officer efforts to investigate the reported assault, as officers explained *ad nauseum* to Plaintiffs, Plaintiffs chose not to provide relevant information about the reported assault that could conceivably shortened the time of the investigation, and instead Plaintiffs unnecessarily lengthened the time of the investigation by repetitiously complaining about officers asking Plaintiffs to identify themselves. Ex. 9 at 05:36-07:15; Ex. 10 at 04:37-06:13.

26. Additionally, "[u]nder the Texas Penal Code, a person commits disorderly conduct if he intentionally or knowingly 'uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace.'" *Ste-Marie v. State*, 32 S.W.3d 446, 449 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (quoting Tex. Penal Code § 42.01). Section 42.01 proscribes Plaintiff Dustyn Banik's conduct in using indecent, profane, and vulgar language in a public place. Ex. 7, at pp.40-41; Ex. 11 at 0:59:15-1:00:00. Similarly, § 42.01 proscribes Plaintiff Gerran Banik's conduct in using indecent, profane, and vulgar language in a public place. Ex. 11 at 0:54:10-0:54:35. Despite probable cause that supported arrest for this offense, Dustyn was not arrested.

27. A reasonable officer may lawfully use subterfuge – including making an inaccurate statement - when performing an investigation, *Wilson v. State*, 1999 WL 548641 *3-8 (Tex.App.-Houston [1st Dist.] 1999, pet. for discretionary review refused),[2] so officers did not violate any Plaintiff's right by merely asking Plaintiffs to provide identification while officers investigated a reported assault. That officers misstated the text of Tex. Penal Code §38.02, or even *arguendo* subjectively believed, albeit mistakenly, that detention was appropriate under §38.02, is wholly irrelevant because the officers' "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause" or reasonable suspicion. *Hall v. Trochessett*, 105 F.4th 335, 341 (5th Cir. 2024), cert. denied, 145 S. Ct. 1173 (2025). "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." *Whren v. United States*, 517 U.S. 806, 813 (1996).

**B. The stop was not unnecessarily prolonged by officers.**

[2] See also, *Wilson v. State of Texas*, 2019 WL 3819537 (Tex. App. – Houston [1st Dist. 2019, no pet.])

28. “Second, [the Fifth Circuit] determine[s] whether or not the officer's subsequent actions were reasonably related in scope to the circumstances that caused him to stop the [suspect] in the first place.” *Bass*, 996 F.3d at 737. “This is because a detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges.” *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004). “There is no ‘constitutional stopwatch’ on investigatory stops.” *Bass*, 996 F.3d at 738 (citing *Brigham*, 382 F.3d at 511). The Court must assess “whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.” *United States v. Sharpe*, 470 U.S. 675, 686 (1985). “A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.” *Id.*

29. Plaintiffs were detained at 8:37 a.m. when Corporal Bruno informed them of the assault investigation and that they were not free to leave. Ex. 10 at 35:28-35:40. Despite Plaintiffs interference about non-existent claimed rights that impeded the assault investigation by prolonging it, Sergeant Burns directed Corporal Bruno to retrieve the store surveillance recording as Plaintiffs asked officers do, and Corporal Bruno departed at approximately 8:55:01 a.m. Ex. 10 at 52:50-53:28; Ex. 11 at 14:30-19:16. While waiting on surveillance video, Sergeant Burns and Officer Jenkins took additional investigative actions to consult with the County attorney, interview Alma Sanchez who was a witness to the events at the gas station, and re-interview Ms. Rogers. Meanwhile, Corporal Bruno drove to the store, recorded surveillance video, reviewed the ten-minute recording, and spoke with the store employee regarding the video. Ex. 5, at pp. 37-38. After that occurred, Corporal Bruno drove back to the investigation site and arrived at 9:27:33 a.m., a

little over 32 minutes after Corporal Bruno left to access the video. Ex. 11 at 38:50- 38:55. Upon arriving at the incident site, officers analyzed the video several times. Ex. 11 at 38:50-45:22. At approximately 9:31:58 a.m., Gerran and Dustyn were released and handcuffs were removed. Ex. 9 at 1:00:19-1:00:57. In short, the Plaintiffs were detained for approximately 54 minutes from 8:37 am to 9:31 am. Ex. 9 at 1:00:19-1:00:57; Ex. 10 at 06:18-06:20. During those 54 minutes, officers made diligent efforts to investigate the reported crime and did not dispel their suspicions until Corporal Bruno returned with the surveillance video Plaintiffs asked officers to retrieve. Ex. 10 at 04:34-04:37. Any unrelated delay was attributable in large part to Plaintiffs' actions of hindering officers' efforts to obtain facts regarding the reported assault, and challenging officer's knowledge of Tex. Penal Code §38.02. See, *Sharpe*, 470 U.S. at 687-688.

**II. No evidence supports a First Amendment claim.**

30. For a First Amendment retaliation claim, a plaintiff must demonstrate: "(1) []he was engaged in constitutionally protected activity; (2) the officer's action caused h[im] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the officer's adverse actions were substantially motivated against h[is] exercise of constitutionally protected activity." *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021). The Supreme Court ordinarily analyzes "First Amendment retaliation claims under the two-step framework set out in *Mt. Healthy City Bd. of Ed*. v. *Doyle*, 429 U. S. 274, 287 (1977)." *Gonzalez v. Trevino*, 602 U.S. 653, 662-63 (2024) (Alito, J, concurring). "The plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest" which Plaintiffs cannot do here, foreclosing this claim. *See Nieves v. Bartlett*, 587 U.S. 391, 402 (2019).

31. "At the first step, the plaintiff must demonstrate that he engaged in protected speech and that his speech was a 'substantial' or 'motivating' factor in the defendant's decision to take action against him." *Id*. "It is not enough to show that an official acted with a retaliatory motive and that

the plaintiff was injured—the motive must *cause* the injury. It must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.'" No evidence shows that Officer Jenkins or Corporal Bruno acted with retaliatory motive to Plaintiffs' speech. Even less so for Sergeant Burns or Lieutenant Raven who took no action to detain Plaintiffs. Sergeant Burns arrived after Plaintiffs were detained and Lieutenant Raven arrived two to three minutes before officers released Plaintiffs.

32. Assuming *arguendo* "plaintiff makes this showing, the burden shifts to the defendant at the second step to show that he would have taken the same adverse action even in the absence of the protected speech." *Gonzalez*, 602 U.S. at 662-63. Here, Officer Jenkins, Corporal Bruno, and Sergeant Burns learned of facts which supported reasonable suspicion to detain the Plaintiffs for the reported assault until officers could dispel that suspicion irrespective of Plaintiffs' speech. Ex. 4 at p. 19; Ex. 5, at p. 27; Ex. 6, at p.23-24. No evidence demonstrates Lieutenant Raven took *any* action against any Plaintiff other than explaining to Dustyn, already free from detention, that an arrest *could* occur for Dustyn's disorderly conduct. Ex. 11 at 59:22-1:00. Gerran testified that he does not claim Lieutenant Raven violated his First Amendment rights. Ex. 1 at p. 69.

33. "As to the second element, 'a retaliation claim requires *some* showing that the plaintiff['s] exercise of free speech has been curtailed.'" *Reitz v. Woods*, 85 F.4th 780, 789 (5th Cir. 2023) (emphasis added) (citing *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)). Here, in no uncertain terms, Dustyn testified that he continues to publicly criticize the police after the incident, and that the detention "didn't stop me, no" from continuing those public efforts to criticize the police. Ex. 2, at p. 58-60, 64-67. Similarly, Gerran emailed the Chief of police in 2026 to continue Gerran's criticisms of the police years after the incident and made further efforts to publicly post on online forums Gerran's criticisms of the police. Ex. 2 at p. 56-57. Plaintiffs' emails informing

the chief of police to "Go f*** yourselves" and that other officers are "trash" is *far* from the curtailment required to show a cognizable injury under the First Amendment. Id. Because the evidence shows reasonable suspicion to detain and probable cause to arrest Plaintiffs, Plaintiffs must show "objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been" to fall within the narrow exception to the probable cause requirement permitted by *Nieves*. *Nieves*, 587 U.S. 391, 407; *see also Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024). No evidence supports a First Amendment claim.

**III. Plaintiffs do not refute any officer's qualified immunity.**

34. Regardless of whether a genuine issue of disputed material fact exists if any officer may have violated a federal right, each officer is protected by immunity because Plaintiffs have not established that any officer violated clearly established law. Qualified immunity is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Swint v. Chambers County Commission*, 514 U.S. 35, 42 (1995). "The plaintiff alone bears the burden of refuting qualified immunity**."** *Perdomo v. City of League City. Texas*,163 F.4th 921, 924 (5th Cir. 2026). "And the burden is heavy." *Morrow v. Meachum*, 917 F.3d 870, 874 (5th Cir. 2019). "When a defendant invokes qualified immunity, the burden shifts to the plaintiff to demonstrate the inapplicability of the defense." *Club Retro LLC v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009) (citations omitted). "When a defendant moves for summary judgment and identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff bears the burden of proof, the defendant is entitled to summary judgment." *Smith v. Harris County*, 956 F.3d 311, 316 (5th Cir. 2020) (cleaned up).

35. "Qualified immunity includes two inquiries. The first question is whether the officer violated a constitutional right," *Id.* at 874, ending the inquiry in this litigation before it starts because Plaintiffs failed to establish that any officer's action was unconstitutional. *See Ramirez v.*

*Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) ("Since *Pearson* [*v. Callahan*, 555 U.S. 223, 231 (2009)], a reviewing court may tackle these questions in whatever order it deems most expeditious."). "The second question—whether the officer violated clearly established law—is a doozy." *Morrow*, 917 F.3d at 874. "To find that a right is clearly established, courts generally 'need to identify a case where an officer acting under similar circumstances . . . was held to have violated' the Constitution." *Zorn v. Linton*, 146 S. Ct. 926, 930 (2026) (citing *Escondido* v. *Emmons*, 586 U. S. 38, 43 (*per curiam*) (internal quotation marks omitted)). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.' *Id* (citing *Wesby*, 583 U.S. at 63 (internal quotation marks omitted). "Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice." *Id* (citing *Kisela* v. *Hughes*, 584 U. S. 100, 105 (2018) (*per curiam*)). "[Plaintiff] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity,' *Morgan v. Swanson*, 659 F.3d 359, 371-72 (5th Cir. 2011), and that places the statutory or constitutional question 'beyond debate.'" *Waganfeald v. Gusman*, 674 F.3d 359, 371-72 (5th Cir. 2011) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *City & Cnty of San Francisco v. Sheehan*, 575 U.S. 600, 611 n.3 (2015). "[T]he clearly established law must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

36. "To be clearly established, a right must be sufficiently clear that every reasonable offic[er] would [have understood] that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (emphasis added) *(citing al-Kidd*, 563 U.S. at 741 (quoting *Anderson*, 483 U.S. at 640)). "In short, officers receive qualified immunity unless they could have 'read' the relevant

precedent beforehand and 'know[ n]' that it proscribed their specific conduct." *Zorn*, 146 S. Ct. at 930 (citing *Sheehan*, 575 U. S. at 616)). "If reasonable public officials could differ on the lawfulness of the defendant's actions, the defendant is entitled to qualified immunity." *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990). Plaintiffs bear the burden of negating the officers' immunity. *See Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). "[Plaintiff] must clear a significant hurdle to defeat qualified immunity." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001). To clear that hurdle, Plaintiff must demonstrate through the governing legal standards that the evidence establishes that no reasonable officer could have believed the officers' respective actions were lawful. *See Saldana v. Garza*, 684 F.2d 1159, 1164-65 (5th Cir. 1982).

37. Not only have the Plaintiffs failed to establish "the legality of [their] conduct was clearly established," *Sorenson v. Ferrie*, 134 F.3d 325, 330 (5th Cir. 1998), Plaintiffs have not shown the misstatements of the penal code, which were not the basis for Plaintiffs' detention, any officer made violated clearly established constitutional law. "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting *Butz v. Economou*, 438 U.S. 478, 507 (1978)); accord *Heien v. North Carolina*, 574 U.S. 54, 57 (2014). While the officers bear no burden to establish immunity, the legal authorities cited support immunity.

**IV. No evidence supports a claim against the City of Brenham.**

38. To avoid summary judgment, Plaintiffs must identify evidence showing: (1) an unconstitutional policy existed; (2) the policymaker knowingly created or tolerated the policy; and (3) the policy was the moving force that directly caused the violation of a Plaintiff's rights. *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.) (en banc), cert. denied, 472 U.S. 1016 (1985). Plaintiffs must show that any such policy was the moving force that directly caused a violation of

Plaintiffs' federally protected rights. *See James v. Harris County*, 577 F.3d 612, 618-619 (5th Cir. 2009). "For the 'moving force' element, a plaintiff must 'show[]either that the policy itself was [facially] unconstitutional' or that it 'was adopted with deliberate indifference to the known or obvious fact' that a specific constitutional violation would follow." *Liggins v. Duncanville*, 52 F.4th 953, 955 (5th Cir. 2022) (quoting *Webb v. Town of Saint Joseph*, 925 F.3d 209, 219 (5th Cir. 2019) (citation and quotations omitted)). Plaintiffs must adduce evidence identifying an unconstitutional governmental policy for which the City's policymaker may be held liable that was the "moving force" driving unconstitutional officer conduct. *Piotrowski v. City of Houston*, 237 F.3d 567, 578–81 (5th Cir. 2001).

**A. Brenham's City Council is the City's policymaker.**

37. "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). An official may have the authority to promote, discipline, and supervise a municipal employee, but that official may still not be considered a policymaker, only a decisionmaker. *Bolton v. City of Dallas*, 541 F.3d 545, 549 (5th Cir. 2008). "The existence of official policymaking authority is a question of law to be decided by the court." *Tharling v. City of Port Lavaca*, 329 F.3d 422, 427 (5th Cir. 2003). "Usually a council or commission will be the governing body to which responsibility may be attached" *Bennett*, 728 F.2d at 767. State courts generally recognize that a city's council is customarily the policymaker for a city. *See City of San Antonio v. Rodriquez*, 856 S.W.2d 552 (Tex. App. — San Antonio 1993, writ denied). "It is fundamental that a municipal corporation possesses no power that is not conferred by its charter or by the general laws under which it was formed." *Central Power & Light Co. v. City of San Juan*, 962 S.W.2d 602, 613 (Tex. App.—Corpus Christi 1998, pet. dism'd). "Liability must rest on official policy, meaning on the city government's policy, and not on the policy of an individual official." *Id*. at 55; *see*

*also* TEX. LOC. GOV'T CODE CHAPTERS 21 and 51. A city's charter and code of ordinances can serve as a source of substance law which identifies a city policymaker. *Id*.; *Bolton*, 541 F.3d at 550. A governing body "may delegate to others the right to perform acts and duties necessary to the transaction of the municipality's business... [but it] cannot delegate the right to make decisions affecting the transaction of city business." *Burch v. City of San Antonio*, 518 S.W.2d 540, 543 (Tex. 1975). A governmental employee is not a "policymaker" unless the governmental entity, through its lawmakers, has **delegated exclusive policymaking authority** to that employee such that the City cannot review the decisions or actions of the employee. *See Worsham v. City of Pasadena*, 881 F.2d 1336, 1340-41 (5th Cir. 1989); *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003). "[P]olicymaking authority is more than discretion, and it is far more than the final say-so." *See Bennett*, 728 F.2d at 769. "When an official's discretionary decisions are constrained by policies not of that official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Praprotnik*, 485 U.S. at 127.

38. The City's Charter and Ordinances evidence the powers and duties of city officials. Ex. 19 The Charter provides City Council with all powers and authority conferred on or possessed by the City, other than powers expressly conferred upon other City Officers by the Charter. *Id* at Art. III §2. The Charter expressly reserves to City Council the power to inquire into the official conduct of any department, agency, office, officer, or employee of the City, and into any other matters of proper concern to City government. *Id* at Art. II, Sec. 5. The Council operates as a singular body and acts through ordinances. *Id*. at Art. III, Sec. 2, 17. No Charter, Ordinance provision, or Resolution has delegated the City's policymaking authority to the Chief of the City's Police Department. Ex. 18.

39. Brenham's former Police Chief Lloyd Powell's operational executive authority, including disciplinary authority, is subordinate to City Council's policymaking authority which has adopted separate policies governing when the City through its City Manager—not the police chief—may terminate a city employee for violation of City policy. Ex. 18, at City's HR Policy pp.6, 105. Similarly, any policy on training is subject "to the review and written approval of the City Manager." *Id* at p. 6. Chief Powell supervised the day-to-day operations of a department of the City, its police department, in conformance with policies established by Council and requirements of federal, state, and local law. Ex. 18. The City's elected Council is the City's policymaker.

**B. No evidence supports a ratification claim.**

40. Ratification is a rarely applicable theory of governmental liability that requires admissible evidence which proves a policymaker approved of an officer's unconstitutional conduct, and the basis for unconstitutional conduct, knowing the actions at issue are unconstitutional. *See Davidson v. City of Stafford*, 848 F.3d 384, 395 (5th Cir. 2017). Even "a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009); accord *Fraire v. City of Arlington*, 957 F.2d 1268, 1278-79 (5th Cir. 1992). To prove a ratification claim, Plaintiff must prove through admissible evidence "the authorized policymakers approve[d] a subordinate's decisions and the basis for it," and only if so, will the policymaker's "ratification…be chargeable to the municipality because [the policymaker's] decision is final." *Praprotnik*, 485 U.S. at 127. Plaintiffs do not provide evidence which proves a Constitutional deprivation, much less City policymaker culpability in endorsing obvious unconstitutional conduct. Certainly, the evidence which records the entire incident made the basis of this suit, Ex. 9-12, does not invoke application of *Grandstaff v. Borger*, 767 F.2d 161 (5th Cir. 1985), since its "precedent has

limited the theory of ratification to 'extreme factual situations.'" *Peterson*, 588 F.3d at 848 (quoting *Snyder v. Trepagnier*, 142 F.3d 791, 798 (5th Cir. 1998).

39. Fatal to Plaintiff's claim, the evidence shows that after the incident made the basis of this suit Chief Powell coordinated a department wide constitutional training on the First and Fourth Amendment *and* Tex. Penal Code §38.02, the statute made the basis of Plaintiffs' complaints. Ex. 8 at p.62; Ex. 6, at p. 15. Providing remedial training after a post-incident investigation which found no unlawful conduct, further affirmed by the Texas Rangers independent investigation who further found no unlawful conduct by any defendant officer, is the opposite of ratification of misconduct. Ex. 8, at pp. 18-23; Ex. 14.

40. Moreover, "[u]nless the subordinate's actions are sufficiently extreme—for instance, an obvious violation of clearly established law—a policymaker's ratification or defense of his subordinate's actions is insufficient to establish an official policy or custom." *Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 795–96 (S.D. Tex. 2013) (Judge Ellison, K. presiding). Plaintiffs approximately one hour detention in handcuffs, most of which inside an air-conditioned patrol unit, is not an "extreme factual situation," under the circumstances of this case. *Compare Peterson*, 588 F.3d at 848 (did not find ratification where officer delivered a knee strike while restraining suspect); *Grandstaff supra* (finding ratification when facts included excessive use of gunfire on truck and killing an innocent bystander); *Snyder*, 142 F.3d at 798 (did not find ratification in case which officer shot feeling suspect in back); *Allen v. Hays*, 65 F.4th 736, 749-750 (5th Cir. 2023) (did not find ratification where officer shot unarmed suspect and the certificate of bravery was not approval of the basis for the conduct). "[A] policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality." *Peterson*, 588 F.3d at 848 (citing *Coon v. Ledbetter,* 780 F.2d 1158, 1161-62 (5th Cir. 1986)).

**C. No evidence supports a failure to train claim.**

41. To state a claim for a policy of failing to train officers, Plaintiffs must allege facts which show: (1) that the City had a policy of failing to train officers; (2) a causal link between a policy of not training officers and Plaintiffs' claimed deprivation; and (3) that the failure to train policy was a product of deliberate indifference by the City's policymaker of Plaintiffs' constitutional rights. *See Roberts v. City of Shreveport*, 397 F.3d 287, 292 (5th Cir. 2005). "In order for 'liability to attach based on an 'inadequate training' claim, a plaintiff must allege with specificity how a particular training program is defective.'" *Zarnow v. City of Wichita Falls Tex.*, 614 F.3d 161, 170 (5th Cir. 2010); *Roberts*, 397 F.3d at 293. The inadequacy of training must obviously result in a constitutional violation. *Bd. of Cnty. Comm'rs of Bryan Cnty, Okl. v. Brown*, 520 U.S. 397, 407 (1997); *Piotrowski*, 237 F.3d at 579. "In this inquiry, mere proof that the injury could have been prevented if the officer had received better or additional training cannot, without more, support liability." *Roberts*, 397 F.3d at 293.

42. Through statutes, Texas has delegated TCOLE as *the agency* in Texas responsible for establishing state-wide officer standards and providing training to officers that is sufficient to prepare them to fulfill the duties entrusted to them. To obtain and maintain a peace officer license, an officer must satisfactorily meet all TCOLE training and licensing standards. Tex. Occ. Code § 1701.307(a); Tex. Occ. Code § 1701.351(a)-(c). Under § 1701.251 of the Occupations Code, TCOLE "shall establish and maintain training programs for officers." More specifically, TCOLE "shall establish a statewide comprehensive education and training program on civil rights…" and which "covers the laws of [the state of Texas] and of the United States pertaining to peace officers" for all licensed law enforcement officers in Texas. Tex. Occ. Code § 1701.253(c)(k).

43. TCOLE standards have been sufficient to satisfy constitutional requirements regarding officer training, hiring and supervision. *Compare Zarnow*, 614 F.3d at 171; *Roberts*, 397 F.3d at

293; *Pineda v. City of Houston*, 291 F.3d 325, 334 (5th Cir. 2002); *Conner v. Travis County*, 209 F.3d 794, 798 (5th Cir. 2000); *Benavides v. County of Wilson*, 955 F.2d 968, 973 (5th Cir. 1992). The evidence shows that each defendant officer was licensed through TCOLE, took an oath to uphold the Constitution of the United States, and had been trained in accordance with TCOLE curriculum including the Basic Peace Officer Course (Training Academy) and TCOLE classes which discuss the constitutional limitations regarding arrest search and seizure. Ex. 15. Moreover, the City's police department policy, which each officer reviews during their orientation phase with the City, titled "Policy 7.1 Constitutional Safeguards" provides further instruction on the constitutional limitations of probable cause and reasonable suspicion under the Fourth Amendment. Ex. 17, at pp.18-22. Further, **addressing Tex. Penal Code §38.02 nearly verbatim**, the City's police department policy 7.2 provides:

> "**In the absence of probable cause to arrest** or reasonable suspicion to justify an actual investigation or stop, the individual may discontinue the interview at any time and leave. **The person may also refuse to produce identification or otherwise identify himself.** The individual does not have to answer any questions or provide any information."

Ex. 17, at City Policy 7.2 (pp28-35) (emphasis added).

44. The City's representative testified that each officer is required to review the police department policy manual, including City policy 7.2, during the orientation phase of employment onboarding. Ex. 8, at pp.40-41; Ex. 6, at p.20; Ex. 5 at pp.19-20, 21. The City further reinforced training of Tex. Pen. Code. §38.02 through its field training program. Ex. 8 at p. 59; Ex. 5 at pp.19-20, 21. At best, Plaintiffs merely assert that the City's training program could have provided better or additional training, which "without more, [cannot] support liability" for a failure to train claim. *Roberts*, 397 F.3d at 293.

45. "[I]solated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578. "A customary municipal policy cannot ordinarily be inferred from single constitutional violations." *Id.* at 581. "The single-incident exception 'is generally reserved for those cases in which the government actor was provided *no training whatsoever.*'" *Henderson v. Harris Cnty., Texas*, 51 F.4th 125, 131 (5th Cir. 2022) (citing *Hucheson v. Dall. Cty.*, 994 F.3d 477, 483 (5th Cir. 2021) (quoting *Pena v. Grande City*, 879 F.3d 613, 624 (5th Cir. 2018). "The 'single incident exception' is extremely narrow; 'a plaintiff must prove that the highly predictable consequence of a failure [to train or supervise a single officer differently] would result in the specific injury suffered, and the failure to [only supervise one officer differently] represented the moving force behind the constitutional violation.'" *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010) (emphasis added by the court) (quoting *Sanders-Burns v. City of Plano*, 594 F.3d 366, 381 (5th Cir. 2010).

46. "The single incident exception requires proof of the possibility of recurring situations that present an obvious potential for violation of constitutional rights and the need for additional or different police training." *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000) (citing *Brown*, 520 U.S. at 409) (emphasis added). But Plaintiffs have not shown any evidence of such a recurrence when Plaintiffs.

47. The Fifth Circuit Court of Appeals did not suggest that insufficient training or supervision was enough for liability on a single incident exception, but rather that "no training" and "no supervision" based on facts could constitute deliberate indifference. *Brown v. Bryan Cnty., Okl.*, 219 F.3d 450, 461 (5th Cir. 2000). "Claims of inadequate supervision and claims of inadequate training both generally require…more than a single instance of the lack of training or supervision

causing a violation of constitutional rights." *Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 382 n.34 (5th Cir. 2005) (internal quotation omitted).

**D. No pattern of unconstitutional conduct exists.**

48. Additionally, Plaintiffs have not shown a pattern of unconstitutional conduct which would rise to the level of an unconstitutional custom. "Prior indications cannot simply be for any and all 'bad' or unwise acts, but rather must point to the **specific violation in question**." *Estate of Davis*, 406 F.3d at 383 (emphasis added). Plaintiffs make a conclusory assertion that the City has a pattern of "non accountability" by failing to properly investigate police misconduct, but the evidence shows the City investigates claims of police misconduct thoroughly and disciplines the officers when appropriate. Ex. 8. Fatal to Plaintiffs' claims, Plaintiff points to an excessive force case which bears no similarity to the allegations made here of unlawful detention. "It is thus clear that a plaintiff must demonstrate a pattern of abuses that transcends the error made in a single case." *Peterson*, 588 F.3d at 842 (internal citations omitted). "A pattern requires similarity and specificity; "[p]rior indications cannot simply be for any and all "bad" or unwise acts, but rather must point to the specific violation in question." *Peterson*, 588 F.3d at 842 (quoting *Estate of Davis*, 406 F.3d at 383). "A pattern also requires sufficiently numerous prior incidents, as opposed to "isolated instances." *Peterson*, 588 F.3d at 842 (internal citations omitted). No evidence supports such a pattern of similarity and instead shows the City investigates claims of misconduct. Ex. 8, at pp. 18-23.

**E. No culpability of, or causation by, the City's policymaker exists.**

49. "[A] plaintiff must show direct causation." *Peterson*, 588 F.3d at 848; accord, *Piotrowski*, 237 F.3d at 580. "The 'moving force' inquiry imposes a causation standard higher than 'but for' causation." *Mason v. Lafayette City-Parish Consolidated Government*, 806 F.3d 268, 280 (5th Cir. 2015); accord, *Fraire*, 957 F.2d at 1281. "The 'moving force' inquiry requires a plaintiff to make

two showings: causation and culpability." *Id.* (quoting *Brown*, 520 U.S. at 404)). "Under the deliberate indifference framework, a party must prove there's a 'causal link' between the policy and their harm, and that the defendant had the 'requisite degree of culpability.'" *Liggins*, 52 F.4th at 955 (quoting, *Brown*, 520 U.S. at 404). "Culpability in this context, is a complete disregard of 'the risk that a violation of a particular constitutional … right [would] follow that decision.'" *Id.* (quoting *Brown*, 520 U.S. at 411). "In practice, that means the decision must've been made despite a very 'high degree of *predictability* concerning the consequences of the challenged decision.'" *Id.* (quoting at *Brown*, 520 U.S. at 460). "That's a 'stringent standard[]' which requires 'unmistakable culpability and clearly connected causation.'" *Id.* (quoting at *Brown*, 520 U.S. at 461). Therefore, the claim against the City fails on any theory of municipal liability because there is no evidence of culpability of, or causation by, the City's policymaker. This is so, regardless of whether the City Council or the Police Chief is found to be the City policymaker. See also, *Covington v. City of Madisonville,* Texas, 2023 WL 5346375 *1-2 (5th Cir. 2023).

CONCLUSION AND PRAYER

50. For these reasons, Defendants move the Court to dismiss Plaintiff's claims, with prejudice, and grant summary judgment in Defendants' favor.

Respectfully submitted,

*/s/ Norman Ray Giles*
William S. Helfand
Attorney-in-Charge
State Bar of Texas No. 09388250
S.D. Texas No. 8791
Bill.Helfand@lewisbrisbois.com
Norman Ray Giles
State Bar of Texas No. 24014084
S.D. Texas No. 26966
Norman.Giles@lewisbrisbois.com
Randy E. Lopez
State Bar of Texas No. 24091829
S.D. Texas No. 3369137

randy.lopez@lewisbrisbois.com

OF COUNSEL:

LEWIS BRISBOIS BISGAARD & SMITH, LLP
24 Greenway Plaza, Suite 1400
Houston, Texas 77046
(713) 659-6767
(713) 759-6830 (Fax)
*Attorneys for Defendants*

CERTIFICATE OF SERVICE

A true and correct copy of the foregoing has been forwarded to the following counsel of record via e-mail on September 30, 2026, in accordance with the District's ECF service rules.

*/s/ Norman Ray Giles*
Norman Ray Giles

Brandon J. Grable
brandon@grable.law
12451 Starcrest Dr.
Suite 206
San Antonio, Texas 78216
(210) 963-5297
(726) 215-4765 Fax

*Plaintiff's counsel*